Good morning, Honorable Justices. I don't want to take up the Court's time reviewing what you've already read. I know you've carefully looked at the briefs in this case. I believe the case is rather simple and probably simpler than the city's representative will tell you. But I would like to focus on one important point, and that's going directly to what is happening when people are out collecting signatures for the recall petition. Because that is the essence of our democracy. The core of our democracy is person-to-person communication, not television advertising or radio ads or magazine ads. We're talking about people out in front of shopping centers, out in front of churches, at swap meets, meeting in person with other people, asking them to sign a petition, taking questions from them, handing out brochures. It's that one-on-one contact that's so important to protect our democracy. This has nothing to do with the candidate election. Not one penny of the money that would be collected for the purpose of collecting signatures would ever find its way into any candidate's chest or chest for their campaign. All this money, excuse me. I'm sorry. Do you have any safeguards so that the money that you collect is not coordinated with someone who might be opposing the incumbent? Well, presumably, anybody who would be collecting signatures for the recall would probably be opposing the incumbent. But a candidate waiting in the wings, wanting to oppose the incumbent. Are there any safeguards to prevent that sort of coordination? Well, the way the city has crafted the statute, they've put everything into one bag and there's no separation there. I'm sure if the ruling was such that that one discrete portion of the recall process, the petition signature collection part, was to be broken off and treated differently, that the city could craft some limitations on the use of any of that money or any coordination. Of course, there are no candidates during the petitioning phase of the recall because the recall hasn't passed yet. And in the city of San Diego, since the city council passed the statute, there's never been a successful recall because they've never been able to collect the signatures. But isn't it possible that the recall we had in the state, that the person who funds it or seeks to get it funded frequently is a person who also wants to run? Is that a problem? I think that would be a problem if there weren't other people that wanted to run. For example, when Governor Schwarzenegger entered the race, Darrell Issa, Congressman Issa, who had bankrolled the petitioning portion, basically didn't have a chance to win and dropped out. So you see, there is a case where some prominent wealthy person bankrolled the petitioning and didn't get anywhere. Didn't get anywhere. Someone else won. That's sort of the practical impact. The question I have, which follows the questions my colleagues have, is, is there anything in the structure of either the ordinances that were in place at the time this lawsuit was decided in the district court or under the new ordinances? There's been some changes to the ordinance? The last change was the change described in the brief whereby the recall process was considered an election, a totality of that. But is there anything in the structure of the ordinance system that would prevent the money delivered to the petition-gathering phase bleeding over into the candidate phase? I think that the City of San Diego's rules now would not allow that because that would be a problem. Can you point to a specific rule? The general statute is cited in the municipal code in the brief. Is there a specific section that says that funds used for the petition-gathering phase may not be transferred to the account of any candidate in the recall election phase? No, because they don't allow us to. They consider the entire process an election. So we haven't gotten to that point yet. That would be the logical way. They said by statute this whole thing is an election? Yes, that's how they, after the last time a city council member was recalled, Linda changed to the ordinance. And that change is set forth in the brief. It's the one change that said, oh, we're going to call the entire recall process an election. From the day you announced that you're planning and intending on collecting signatures, that's the first day of the election. Therefore, you'll be treated as though you're collecting money for a candidate. That's what we object to. You can do that, but now it makes it what was before perhaps an election, now an election. That's exactly what happened and that's why we're here. That's what they did. Excuse me. It's the last amendment to the ordinance. Yeah, I think you're going to probably have some rebuttal time and you or your associate there can find it and tell us about it. My question was, is your challenge focused precisely on petition gathering? Absolutely. Our organization is... ...contribution limits that relate to the recall election itself? Not at all. We believe in those. My client 100 percent supports the existing structure of the city of San Diego's contribution ordinance. All we're saying is that one discrete portion between the time you start collecting signatures and you're done collecting signatures and you turn them into the city clerk for review, that part of it should not be called an election. That should be open just as collecting petition signatures for an initiative is open. So if you collect the funds for putting the recall on the ballot and it's successful, can any of the funds that were collected for the petitioning process, can those be used for candidate or candidates that might challenge the incumbent? Under the city of San Diego structure, no, because then they would be candidate contributions. Again, this would be only if the law was changed to allow us to collect the money to do the petition gathering. And it'd be very simple change in the city of San Diego statute to achieve that. We absolutely support the candidate contribution limits in every way. Does the city have a legitimate interest in preventing a single individual or a group of individuals from controlling the recall process through their monetary contributions? Well, and the city uses the argument, the big box builder argument in its brief. I can tell you when you think about it, it's almost impossible to control a recall. Once the petition signatures are collected, if there are enough of them, then it's wide open and it's a person can win with less than 50% of the vote. So the... I suspect the answer you're giving, the response you're giving assumes that there's somebody behind the recall petition gathering that has some interest in running for it. My question is more general than that. Doesn't a municipality have a legitimate interest in preventing domination of the process by which recall elections even occur? I don't think so, because the collection of the petition signatures doesn't lead to any particular outcome in the election. The voters still have to vote on it. If they like the incumbent in, here's what I was, the point I was trying to make is this wealthy person who wants to control the process better watch out, because he may get someone elected that is even worse to his interest as the incumbent. It's sort of letting a genie out of the bottle, just like in the case with Schwarzenegger. Well you're talking about practical aspects again, but with unlimited contributions to just the petition gathering phase, couldn't a single individual or a group of wealthy individuals in effect hold a hammer over the head of members of the city council that didn't vote their way? I suppose they could, in the same way that those wealthy individuals could bankroll an initiative to undo whatever the council member wanted to do, or to put term limits in to kick them out, or any of the other things that can be done with an initiative at a city level. San Diego's had some particularized problems with corruption, haven't they? Yes, they have. You've got a congressman who's gone to prison? Correct, Duke Cunningham. Judges who have been convicted in federal court of taking bribes? And I have appeared before some of those judges before they went to jail. City council people who didn't disclose contributions from people with an interest in zoning decisions? That's correct. And the SEC yesterday issued an order and a settlement accusing existing city council members of knowing fraud. In that environment, what's wrong with a city wanting strict campaign contribution limits on every aspect of the election process, including recall? Well, because isn't it the right of the people, if they don't like their representative, to wait four years and let them control the government? I mean, it would be our opinion that the only reason the city council passed this law is to protect themselves. That's why they did it. They don't want recall. Recall is the voice of the people coming up. Recall is kind of a sacred thing in California. After years of control by the Southern Pacific Railroad, the progressives put in recall referendum and initiative to avoid that kind of control. It could be argued that recall is necessary to prevent corruption, not the other way around. Oh, go ahead. The amount, along the line of Riddell, is $215 simply too small an amount for anybody to be able to function under this statute? No, it might not be if we had more time to collect the signatures. The problem is there's a time limit, and that we review that in our brief, that you have to begin and finish collecting the signatures. San Diego is a big city, 1.4, 1.5 million people, and that's a lot of signatures of registered voters that have to be collected. If a single $250 would not be enough to pay for the printing of the initiative petitions, if one person wanted to do it, you would violate the rule right there. Have you made arguments that that's part of the problem here? Yes, we've argued the time. Other cities in San Diego County have up to a six-month time period you can collect signatures. That gives a lot more time to organize and collect money. Do you have some time left? Did you want to save it for a rebuttal? Yes, I did. Okay, thank you very much for your argument. We'll hear from the other side at this point. Mr. Walters? Yes, sir. Good morning. Good morning, Your Honors. If I may, I would just like to cut to the chase here and respond very quickly to questions that the judges had about the structure that was in place with the City of San Diego that might impact how expenditures might be occurring once they're obtained. There is, if the court, as I'm sure you have, has looked at the ordinance, there is no structure that would limit how money is to be used. In fact, that would probably be a constitutional infringement by virtue of independent expenditures. And the U.S. Supreme Court, as well as this circuit, has repeatedly held that limitations on independent expenditures would not survive First Amendment challenges. So, but I think the astute observation is that it recognizes the practical realities. And I think this was buttressed more in a case that unfortunately was not cited in the original briefs and Ninth Circuit case, we have added it today, and that's the Jacobus v. Alaska case. And in that case, the issue was limitations on soft money contributions. And the issue there, interestingly enough, was not whether it was focused on the limitations so much as that there was no identification of a candidate as such. These were limitations to contributions to parties, much like the recall signature gathering process. There's no candidate identified, so similar to the Jacobus case, there is no candidate at issue. But the practical reality, and I think what the Jacobus case also indicates, is that you have the danger of corruption or the appearance of corruption, and possibly even a circumvention of actual hard contribution limitations. And so this is what the city seeks to avoid with the ordinance. Now, some time has been spent on wanting to separate out from the ordinance just the signature gathering process, and as the district court recognized, you really can't do that. It's really reverse election. You are saying to the people, we're not happy with the incumbent. We feel like we've gotten enough support to get this individual out of office. But they're saying we don't have enough time to gather the signatures, and besides which, the limitations on the contributions are unfair because we're going to look at the signature gathering process as more like a ballot measure. There were no candidates at issue. It's an issue. And is there a concern that there's a coordination with another candidate, that the contributed funds are going to be spent to assist a candidate waiting in the wings? Well, there certainly is nothing that would preclude that, and even if there were something to preclude that, as I was indicating earlier, that might be unconstitutional in and of itself as a limitation on expenditures, which specifically are for or against a particular candidate. So we have a dilemma, as a practical matter, is there's no structure that says you can't, but it's kind of allowing an individual or group of individuals to accomplish indirectly what they could not accomplish directly. There's some language in the Shrink Missouri case suggesting that there needs to be, that the government needs to provide some evidence that there's corruption or an appearance of corruption that's being used. Does San Diego have any experience or any actual incidents that they can point to? In the recall context, the answer would be no. As Judge Haskins, or excuse me. Haskins, your opponent. I'm going to get this right in just a minute. As Judge Haskins pointed out, there has been a series of events in the city of San Diego that remind voters pretty much every day that there is the potential for corruption, and so you really can't separate out the recall from the general political process. It's a public perception. Now, as to specific evidence, no. There was none presented in the proceedings below. This originally started out as a motion for preliminary injunction, came before this court on the district court's denial of the preliminary injunction, and then I think it went from that to a stipulated judgment. So really there was no factual development either as to the actual prejudice or inability by the appellants or the plaintiffs of being unable to obtain the necessary signatures or an opportunity for the city to indicate what corruption or appearance of corruption there might be. So unfortunately the record is devoid of any factual basis for both sides, frankly. What's the standard of review? The standard of review, if we're focusing on contributions alone, the U.S. Supreme Court as well as the Ninth Circuit has recognized the contributions versus expenditures versus ballot measures are not held to the strict scrutiny. It's a much less rigorous standard whether there's an important governmental interest and whether the means are closely tailored to the accomplishment of the governmental interest. From the Buckley case on down, the recognition is that contributions as opposed to expenditures, for example, marginally affects speech. In fact, as the appellants had pointed out, these people are out on the street. The declaration that was in support of the original motion for preliminary injunction was we're going to be out there, we're going to be explaining why Mr. Peters needs to be out of office, we're going to be talking to people, we're going to be soliciting their feedback. So clearly they recognize that there is no infringement on speech as such. Could there be an impact on association? Perhaps, but there is no showing that the $250 limit per person or the time limit itself simply will not allow that process to occur. It's basically theoretical in substance. I think I know what the answer to this is. I just want to be clear about this. I hope I gave you the right one. No, no, I just want to confirm. Is there anything in the record that we have where the city offered evidence of a compelling or substantial interest in this particular ordinance? I don't believe that there was. The answer is no, isn't it? Yeah, the simple answer is no. Of course, the appellate decisions, including the U.S. Supreme Court, abound with the recognition that practical experience has demonstrated that this appearance of corruption, just the possibility that if unlimited expenditures were allowed, you could be given free access to a wealthy group of individuals, say, here, here's some money. And then the recall petition gathering is successful and you do a kick-up luncheon or event to, say, introduce the candidate at issue. And, by the way, Mr. Candidate, we'd like to introduce you to Mr. So-and-so, and you know you wouldn't be here but for his $100,000 that went to the signature gathering process. Probably the first time in American politics that's ever occurred. You know, I think it would be. And not only that, it would be very surprising if that candidate didn't have some confidence that those individuals, if allowed, to provide unlimited expenditures would be back there. And those persons providing those expenditures or contributions are banking, theoretically, on a certain person to get into office. You know, nobody's going to throw out a lot of money necessarily with no expectation. You know, whether it's successful or not is another thing, but without any expectation that their candidate of choice is not going to be in the running and might ultimately be successful. I think it was Huey Long who said those who contribute early get access, those who contribute late get good government. Your opponent suggests that this is an incumbent protection system. What's your response to that? I wish I had a good response to that, Your Honor. I don't see that. I think it's a little coincidental that this amendment occurred after a recall effort very early. And certainly there was city attorney opinions that would have suggested that the earlier practice would not have limited contributions. But maybe there needed to be a little bit of control on this because it certainly identified the pitfall of you leave this wide open and you're setting yourself up for not just protecting incumbents, but all of a sudden getting people in to disrupt the whole decision or legislative body process. This system is more restrictive than the prior system? In the sense that, as the appellants correctly pointed out, it deems the signature gathering portion to be part of the election process. And this is at least in part in response to a successful recall? There's no factual evidence to that. The inference certainly is there. Just for clarification, the ordinance that was cited in the briefs, 27.2941, when I was looking for that, I found that there was a 2005 revision to the ordinances, so it was now numbered differently, 272935, and there were some language changes. Is that correct? Is there a 2005 amendment now for that ordinance? Your Honor, I'm sorry. I personally was not aware of that revision. To which ordinance? 27.2941. The language was somewhat changed. Maybe you could look into that and let us know. Sure. Okay. I think we understand your argument. Would you like me to supplement? I think there may well be a follow-on order I'll confer with my colleagues in conference, both on whether there have been any textual changes to the ordinance involved, and, of course, we will want to give the Citizens Group an opportunity to respond to the Jacobus opinion. Okay. Very good. Thank you for your argument, counsel. Rebuttal? Your Honors, I would point out that there has yet to be an articulation by the city of the connection between the petition signature-gathering element of a recall and corruption. I don't know if they've really even explained why it was necessary to amend the statute to include the recall as part of an election under the entire procedure under the city to limit campaign contributions. And that was, as you had asked for, ma'am, on the top of page 12 in the opening brief for appellants. We believe that change was made. The statute would be 27.2903 of the Municipal Code, and it is the highlighted section at D on the top of page 12, which included the definition of a city officeholder who becomes the subject of a recall election, that process being considered an election. Thank you. Now, we disagree with the city in the level of standard of review. We believe it is strict scrutiny, and here's why. This is petitioning. This goes to the core of the First Amendment and the rights of the people. This is the collection of signatures is something which is of critical importance. The Meyer case says it is core political speech. That was the case that overruled Colorado law that stated that you could not pay signature-gatherers. The purpose of the city statute, now this is very interesting. I'd like to just read the sentence, but the purpose, the rationale behind this whole statute, and that is, and this is on page 22, the middle paragraph in our opening brief, to avoid the corruption or the appearance of corruption brought about when candidates for elective office accept large campaign contributions. This is in your brief? This is in the brief. And this says nothing about recall. This says nothing about that process or gives the additional rationale which one would think would be necessary to explain the motivation to the basis for making the changes later on, which have made it, in our view, pretty much impossible to recall a city official in the city of San Diego. Again, no evidence of corruption. Your Honors have talked about what is read in the newspapers and magazines about corruption in San Diego. We believe the best way to prevent corruption is to hold politicians accountable, and that's what a recall does. I think it's unfair to say, well, because maybe a wealthy person might bankroll the petitioning portion of a recall, we need to make it impossible for all those people who aren't wealthy to put maybe $500 or $600 in or maybe $1,000 for the petition-gathering portion of a recall. I think that's so important, that's such a core value of ours in our democracy, that the possibility, and it's only speculation on behalf of the city here this morning, the possibility that perhaps a wealthy person might bankroll the petition-gathering section of a recall. Okay. I think we understand your argument. Thank you very much for coming in this morning.
judges: Hall, Hawkins, Ikuta